UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:12-CV-23-F

| | |
|---|---|
| PHILLIP J. SINGER, Individually and on Behalf of All Other Persons Similarly Situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | ORDER |
| TRANS1, INC., KENNETH REALI, JOSEPH P. SLATTERY, RICHARD RANDALL, and MICHEAL LUETKEMEYER, ) ) ) ) ) | |
| Defendants. ) ) | |

This matter is before the court on the Trans1's[1] motion for reconsideration [DE-50]. The motion has been fully briefed and is ripe for ruling.[2] For the reasons that follow, the motion is ALLOWED and the September 19, 2013 order [DE-48] and judgment [DE-49] are VACATED under Federal Rules of Civil Procedure 59 and 60. However, the motion is allowed without prejudice to Trans1 to file a renewed motion to dismiss the amended complaint and Trans1's prior 12(b)(6) arguments are not waived.

---

[1] TranS1 has recently changed its corporate name to Baxano Inc, and filed an unopposed motion to change the caption of the case [DE-45]. For purposes of consistency, the court will refer to the company by its former name. However, because Singer has been appointed lead plaintiff, the court refers to the plaintiffs collectively as "Singer" for purposes of this order.

[2] Singer argues that Trans1's response brief was filed five days late. That is not the case. In this district, litigants are permitted three extra days beyond the calendar deadline to file responsive pleadings. *See* Fed. R. Civ. P. 6(d); CM/ECF Policy Manual at 10, *available at* http://www.nced.uscourts.gov/cmecf/default.aspx. When the deadline falls on a holiday or weekend, the brief is due the following business day. Fed. R. Civ. P. 6(a).

## I. PROCEDURAL AND FACTUAL BACKGROUND

Singer initiated this action on January 24, 2012, by filing a Class Action Complaint [DE-1] alleging claims for violations of the federal securities laws. The court dismissed Singer's Amended Class Action Complaint [DE-29] with prejudice by its September 19, 2013 order [DE-48]. Singer now moves for reconsideration.

TranS1 is a publicly-traded medical device company that designs, markets, and sells medical devices used in spinal procedures. The AxiaLIF line of products is the company's primary source of revenue. AxiaLIF is a type of spinal surgery in which the surgeon performs spinal fusion and motion preserving surgeries utilizing a "pre-sacral approach." The pre-sacral approach allows the patient to remain on his stomach throughout the procedure as the surgeon performs the procedure straight up the tailbone. This procedure is different than most spinal surgeries, which utilize an "anterior" or frontal approach, where the surgery is performed through the frontal portion of the spine with the patient positioned on his back.

Insurance reimbursement decisions for AxiaLIF are dependent on the American Medical Association's (AMA) "Current Procedural Terminology" (CPT) codes. The CPT system divides physician services into three distinct categories and eligibility for reimbursement for a particular procedure is often dependent on the procedure's CPT code. Category III is typically reserved for newer or experimental procedures where limited research data is available regarding safety and effectiveness. Various federal statutes require surgeons to use the appropriate CPT code on reimbursement forms.

Prior to 2009, surgeons could code the AxiaLIF procedure as an anterior fusion procedure

under Category I and easily obtain reimbursement from insurance providers. In 2008, on the recommendation of the National Association of Spine Surgeons Reimbursement Coding Committee, the AMA changed the CPT code for AxiaLIF to Category III. The new Category III CPT code became effective January 1, 2009. After the new designation, most insurance providers refused to reimburse surgeons performing the AxiaLIF procedure, allegedly "threatening the future viability of [TranS1]." Singer's Resp. in Opp'n to Mot. to Dismiss [DE-41] at 5.

Singer alleges that in response to the Category III designation, TranS1 developed a fraudulent reimbursement scheme in which it "coached" physicians to avoid the Category III CPT code to obtain reimbursement for the procedure. The allegedly fraudulent scheme involved multiple components: a reimbursement committee which presented information to surgeons regarding how to avoid or conceal the Category III designation; illicit conference calls with distributors in which TranS1 instructed distributors to advise surgeons to use a Category I CPT code for the AxiaLIF procedure; training sessions and development of a coding template designed to "coach" surgeons to avoid or conceal the Category III designation; a reimbursement guide advocating various methods for concealing the Category III designation; and national meetings in which TranS1 instructed physicians and other employees in various methods to avoid the Category III designation. Much of the evidence for the allegations comes from confidential witnesses who are former employees of the firm.

Singer alleges that each of these practices violated various federal healthcare fraud statutes, including the False Claims Act, 31 U.S.C. § 3729 *et seq.*, creating a substantial risk of regulatory investigation and civil and criminal penalties. Moreover, TranS1's investors allegedly

3

purchased TranS1 stock at an artificially-inflated price because TranS1 never disclosed that it was illicitly coaching surgeons to avoid the Category III designation.[3]

Instead of alerting investors to the risk of regulatory oversight and civil/criminal penalties, Singer alleges that TranS1 submitted public statements regarding the Category III designation that were materially misleading and contained material omissions, all in violation of the federal securities laws. For example,[4] Singer alleges that the following statement is materially misleading and contains material omissions because it fails to inform investors of TranS1's fraudulent scheme to advise surgeons to avoid the Category III designation:

> We will continue to work with our surgeon customers to generate published, peer reviewed clinical literature that demonstrates our procedure's clinical efficacy and safety. We will also work to leverage this data along with our AxiaLIF surgeon advocates, with payors to secure positive coverage decisions for the reimbursement of the AxiaLIF procedure.

Am. Compl. [DE-29] ¶ 89. Obviously, this statement does not contain any disclosures regarding TranS1's instructions to surgeons to bill the procedure as a Category I procedure or to bury the Category III code. TranS1 made multiple similar statements regarding reimbursement of the AxiaLIF procedure, none of which disclosed that TranS1 was allegedly coaching physicians to avoid the Category III designation. *See, e.g.*, *id.* ¶¶ 59, 61, 64, 75, 78.

Singer also alleges that all of TranS1's reported financial results during the class period contained material omissions because TranS1 failed to explain that the revenues were derived

---

[3] Presumably, if the market had known about TranS1's fraudulent coaching of surgeons to avoid the Category III designation, the market would have known about the risk of regulatory oversight and the stock price would have been significantly less than what the class members paid.

[4] In light of the analysis below, the court does not find it necessary to recite all of the misleading statements/omissions contained in the amended complaint. Instead, the court provides a representative sample.

4

from the fraudulent reimbursement scheme. *Id.* ¶¶ 63, 67, 70, 71, 73, 77, 79, 81, 82, 84, 85, 87, 91, 92, 94. Singer also cites to TranS1's statements that it was attempting to comply with various healthcare fraud statutes and regulations as materially misleading inasmuch as none of those statements disclosed the allegedly fraudulent reimbursement scheme. Singer's Resp. in Opp'n to Mot. to Dismiss [DE-41] at 11; TranS1 Form 10K for period ending Dec. 31, 2010 [DE-33-19] at 15.

The risk associated with the purportedly fraudulent scheme "materialized" on October 17, 2011, when TranS1 disclosed that it had received a subpoena from the Department of Health and Human Services (DHHS). On that date, TranS1 filed an SEC Form 8K, which disclosed the following:

> On or about October 6, 2011, TranS1 Inc. (the "Company") received a subpoena issued by the Department of Health and Human Services, Office of Inspector General, under the authority of the federal healthcare fraud and false claims statutes. The subpoena seeks documents for the period January 1, 2008 through October 6, 2011. The Company is cooperating with the government's request and is in the process of responding to the subpoena. The Company is unable to predict what action, if any, might be taken in the future by the Department of Health and Human Services, Office of Inspector General or other governmental authorities as a result of the matters related to this subpoena or what impact, if any, the outcome of these matters might have on its consolidated financial position, results of operations, or cash flows. No claims have been made against the Company at this time.

Am. Compl. [DE-29] ¶ 98. The first Amended Complaint also cited an "analyst report to clients," which, on October 18, 2011, noted that:

> Management mentioned in our conversation that they have "let so many reps go in the last year and a half" (due to downsizing), which makes us think the subpoena could perhaps stem from allegations by a disgruntled former employee. Another speculation would be since about half of TranS1's revenues come from physicians still using the ALIF code (which provides reimbursement), rather than the designated T-code (which does not provide reimbursement), the issue could be due to reimbursement communications, although we think that the Company has been

> making strong efforts to educate physicians about correct coding. Note that
> ultimately the decision regarding which code to use lies in the hands of the physician.

*Id.* ¶ 99. When trading ended on October 18, 2011, TranS1's shares had fallen approximately 40%, closing at $1.85.

Several months prior to Trans1's receipt of the DHHS subpoena, Kevin J. Ryan, a former Clinical Sales Manager with the company, filed a sealed *qui tam* complaint against Trans1. The *qui tam* complaint alleged that Trans1 defrauded federal and state governmental agencies by submitting false claims and receiving improper reimbursements. The *qui tam* complaint contains allegations regarding Trans1's efforts to coach physicians to avoid (or conceal) the Category III designation on insurance reimbursement forms (mirroring Singer's allegations described above). Singer alleges the *qui tam* complaint was the catalyst for the Government subpoena Trans1 received on October 6, 2011 and disclosed on October 17, 2011. The case remained sealed until July 1, 2013, when the complaint and a settlement agreement between the parties were made public.[5] Although Trans1 did not admit liability as part of the settlement, it agreed to settle the claims for $6 million, nearly 28% of the company's cash on hand. However, the agreement provides for structured payments of that amount over several years. The settlement agreement indicates that the United States intervened in the *qui tam* suit and alleged claims for, *inter alia*, illegal reimbursement practices.

As noted, the court allowed Trans1's motion to dismiss on September 19, 2013. The court concluded that the amended complaint failed to adequately allege loss causation. Singer now moves for reconsideration of that order, arguing the court made a clear error of law. In the

---

[5] Trans1 publicly disclosed a "settlement in principle" in the case on December 27, 2012.

6

alternative, Singer requests leave to amend the complaint.

## II. STANDARD OF REVIEW

Although the parties focus their arguments on reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure, the legal standard associated with that rule is largely irrelevant to Singer's motion. This is so because Singer requests leave to amend the complaint. Where a party requests postjudgment leave to amend, the court "need not concern itself with either of [Rule 59(e) or Rule 60 of the Federal Rules of Civil Procedure's] legal standards." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). Instead, the court should "evaluate a postjudgment motion to amend the complaint 'under the same legal standard as a [motion filed under Federal Rule of Civil Procedure 15(a)] filed before judgment was entered . . . .'" *Id.* at 471 (quoting *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc)).

Rule 15(a) provides, in relevant part, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). District courts should liberally allow amendments:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). However, leave to amend is "not to be granted automatically," *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987), and a district court has discretion to deny amendment so long as the court does not "outright refuse 'to grant the leave without any justifying reason.'" *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)

7

(quoting *Foman*, 371 U.S. at 182). An amendment is futile under Rule 15(a) if the amended complaint would not survive a Rule 12(b)(6) motion to dismiss. *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995).

### III. THE ANALYST REPORT

Singer's proposed amendments mostly relate to the October 18, 2011 analyst report, which Singer argues supports his position that the proposed amended complaint adequately alleges loss causation. Loss causation, which is a required element of a securities fraud claim, refers to "the 'necessary causal link' between the defendant's alleged fraud and the plaintiff's economic harm." *Katyle*, 637 F.3d at 472 (quoting *Dura Pharms. v. Broudo*, 544 U.S. 336, 346 (2005)). The complaint must allege "facts to show . . . that the misrepresentation or omission was 'one substantial cause of the investment's decline in value.'" *Id.* (quoting *In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009), *rev'd on other grounds*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)). Stated in tort terms, "the defendant's misrepresentation (or other fraudulent conduct) [must] proximately cause[] the plaintiff's economic loss." *Dura*, 544 U.S. at 346. Loss causation must be alleged with "sufficient specificity" to "'enable the court to evaluate whether the necessary causal link exists.'" *Katyle*, 637 F.3d at 471 (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007)). "Because loss causation is fact-dependent, the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." *Id.* The plaintiff must at least "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

In *Dura*, the United States Supreme Court addressed the loss causation requirement in

8

some detail. The Court concluded that a plaintiff cannot plead loss causation by alleging that he purchased a security at an inflated purchase price caused by the concealed fraud because "at the moment the transaction takes place, the plaintiff has suffered no loss." *Dura*, 544 U.S. at 342. The Court further explained that if the plaintiff sells "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. [But] [i]f the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss." *Id.*

Singer's loss causation allegations in this case are premised on two disclosures to the marketplace: (1) Trans1's disclosure that it received a government subpoena from the Department of Health and Human Services and (2) an "analyst report" that noted the subpoena may be related to "reimbursement communications" between Trans1 and physicians using the incorrect CPT code for the AxiaLIF procedure. The analyst report, "published" one day after Trans1 disclosed the subpoena, observed the following:

> Management mentioned in our conversation that they have "let so many reps go in the last year and a half" (due to downsizing), which makes us think the subpoena could perhaps stem from allegations by a disgruntled former employee. Another speculation would be since about half of TranS1's revenues come from physicians still using the ALIF code (which provides reimbursement), rather than the designated T-code (which does not provide reimbursement), the issue could be due to reimbursement communications, although we think that the Company has been making strong efforts to educate physicians about correct coding. Note that ultimately the decision regarding which code to use lies in the hands of the physician.

Am. Compl. [DE-29] ¶ 99. The operative complaint at the time of the September 19 order described the report as an "analyst report to clients." In the September 19 order, the court noted that Singer failed to address this report in its briefing on the motion to dismiss and the court therefore assumed it was not relevant for purposes of the loss causation analysis. The court also

9

noted that because Singer described the report as an "analyst report to clients" the court assumed that it was not publicly disclosed and therefore could not be considered a revelation of the truth under *Dura*. *See* Sept. 19, 2013 Order [DE-48] at 14 n.7.

Singer's instant motion argues that this conclusion constitutes a clear error of law. In addition, many of Singer's proposed amendments attempt to address the court's concerns with this report. For example, the proposed second amended complaint deletes the phrase "to clients" and notes that the analyst report was "published" on October 18, 2011." Proposed Second Amended Class Action Complaint, Redline Version [DE-51-1] ¶ 109. The content of the report, quoted above, is the same in both versions of the complaint. Thus, most of the proposed amendments related to the analyst report are designed to address the court's concern that the analyst report was not publicly disclosed and thus insufficient for purposes of the *Dura* revelation of the truth requirement.

The court will allow the amendments and vacate the prior order and judgment. As an initial matter, the court explains why it has decided to revisit its prior decision that Singer waived any arguments related to the analyst report by failing to address the report in his opposition to the motion to dismiss. *See* Sept. 19, 2013 Order [DE-48] at 14 n.7 ("However, [Singer fails to] mention[] this disclosure in [his] briefing on the motion to dismiss and, thus, the court assumes it is not relevant for purposes of the loss causation analysis."). Ordinarily, "[u]nsupported and undeveloped arguments are waived." *See City Grill Hospitality Grp. v. Nationwide Mut. Ins. Co.*, No. 5:12-CV-610-F, 2014 WL 1429552, at *4 n.4 (E.D.N.C. Apr. 14, 2014) (quoting *Long v. Teachers' Ret. Sys.*, 585 F.3d 344, 349 (7th Cir. 2009)). However, in the context of this case, the court has decided to make an exception to this rule. Trans1 launched an extraordinarily

10

lengthy number of legal challenges to Singer's complaint in the original motion to dismiss. Without ordering additional briefing on the issue, the court dismissed the complaint with prejudice solely on loss causation grounds and in the process summarily dismissed an allegation that potentially supported Singer's loss causation argument. Upon further reflection, and in light of the fact that both parties' loss causation arguments represented relatively small portions of the briefing on the motion to dismiss, the court has determined that it should have at least ordered additional briefing on this issue before dismissing the complaint with prejudice. As such, the court has decided to consider the analyst report (and the proposed amendments relating thereto) in the context of the motion for reconsideration.

Doing so, the court finds that the proposed amendments are not futile. Singer is proceeding under a materialization of a concealed risk theory in this case, which the Fourth Circuit has recognized as a viable theory of loss causation. *See Teachers' Ret*, 477 F.3d at 187 n.3; *but see Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010) ("Although 'materialization of risk' runs like a mantra through the parties' briefs, we do not think that it has any significance. The phrase appears in a few decisions to describe particular claims, but it is not a legal doctrine or anything special as a matter of fact." (citations omitted)). In the Fourth Circuit, materialization of a concealed risk is defined as a stock price decline caused by "negative investor inferences drawn from the disclosures [which] 'were a foreseeable materialization of the risk concealed . . . .'" *Katyle*, 637 F.3d at 477 & n.10 (internal quotation marks omitted). Singer's argument is that the analyst report is evidence that the disclosure of the subpoena caused investors to infer the existence of improper reimbursement practices related to AxiaLIF (which in turn caused the stock price decline) and that these negative inferences were a "foreseeable

11

materialization of the risk concealed" by the misrepresentations. *Katyle*, 637 F.3d at 477 (internal quotation marks omitted).

In the September 19 order, the court was concerned that the disclosure of the subpoena, standing alone, was not a sufficient "revelation of the truth" under *Dura*. As the court noted, the subpoena did not reveal the truth regarding the purported misrepresentations or the fraudulent conduct to the investing public. September 19, 2013 Order [DE-48] at 24. The analyst report and the related proposed amendments[6] change that conclusion. The analyst report specifically refers to the coding issues with AxiaLIF and notes that the subpoena may be related to Trans1's reimbursement communications with physicians. This report, when considered in conjunction with Trans1's disclosure of the subpoena, therefore calls into question Trans1's prior representations that it was educating physicians about proper coding and reveals to the public, at least in some sense, that Trans1 was potentially improperly manipulating the insurance reimbursement system. *See In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009) ("To demonstrate the connection between the statements and the events—termed 'materializations of the concealed risk'—plaintiffs must show (1) that these events were foreseeable consequences of the alleged fraud; and (2) that these events revealed new information previously concealed by defendants' alleged fraud." (citations omitted)). If the market understood that the subpoena was potentially related to reimbursement communications between Trans1 and physicians regarding AxiaLIF, it is plausible the subpoena and the accompanying analyst report constituted an event in which "the truth began to emerge" under

---

[6] As discussed, Singer initially alleged that the analyst report was disclosed solely "to clients," which suggests the report was not publicly disclosed. The new amendments delete the phrase "to clients" and note that the analyst report was "published."

12

*Dura*. 544 U.S. at 342. If a corrective disclosure need not fully reveal the falsity of a prior misrepresentation, *see Katyle*, 637 F.3d at 472, then the event constituting materialization of the concealed risk also need not fully reveal the fraudulent nature of the prior statements.

Trans1 argues that the analyst report can be disregarded under the Fourth Circuit's market speculation rule. In *Katyle*, the Fourth Circuit held, "[s]entiment simply is not enough to sufficiently plead loss causation. Speculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact." *Katyle*, 637 F.3d at 477. However, in the next paragraph, the Fourth Circuit explained that the market speculation rule only applies in corrective disclosure cases: "[t]o be sure, the six purported corrective disclosures [which consisted of market speculation] identified in the TAC alerted investors to the ever-mounting risk that the deal was unlikely to close [which may be sufficient for purposes of a materialization of a concealed risk case]." *Id.* Because Singer is proceeding under a materialization of a concealed risk theory, the fact that the analyst report was speculative is simply not relevant for purposes of the loss causation analysis.

The court also finds that allowing the amendment would not be unduly prejudicial to Trans1. While it is true that Trans1 successfully argued one motion to dismiss already and the court entered judgment dismissing this case, delay alone is not sufficient to find prejudice in the context of a motion to amend. *Laber*, 438 F.3d at 427. This is not a case where extensive discovery has been completed and a party proposes the amendment on the eve of trial/summary judgment. *See id.* ("A moment's reflection reveals, however, that the further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant . . . ."). In fact, because the court has not ruled on any of Trans1's other arguments

13

regarding the complaint's alleged deficiencies, Trans1 will likely be able to simply copy and paste most of its arguments from its original briefing into the new motion to dismiss the amended complaint. Accordingly, Trans1 is not unduly prejudiced by these amendments, despite the substantial delay they have caused.

To summarize, the analyst report and the proposed amendments change the loss causation analysis in this case. The report discloses that the DHHS subpoena may be related to reimbursement communications between Trans1 and physicians regarding AxiaLIF. In the court's view, that is sufficient to satisfy *Dura*'s requirement that the relevant truth about the prior alleged misrepresentations began to leak out, at least at this stage of the proceedings. The court also finds that allowing this amendment is not unduly prejudicial to Trans1 as discovery has not started and the case remains at a relatively early stage. Moreover, and as discussed in more detail below, Trans1 will have another opportunity to move to dismiss the complaint on alternate grounds.

## IV. OTHER AMENDMENTS

Singer's remaining proposed amendments relate to various public disclosures regarding Trans1's settlement of the *qui tam* complaint. Singer argues these new factual developments support a finding of loss causation and scienter. Although the court has concerns about the relevance of these amendments, especially to the loss causation issue,[7] the court has decided to allow the amendments at this stage of the proceedings. It is possible these amendments may be

---

[7] Because loss causation is predicated on the market's knowledge at the time of the stock price decline, *see Teachers' Ret.*, 477 F.3d at 187 (explaining market cannot react to information never revealed) the court fails to see how the settlement and unsealing of the *qui tam* complaint are relevant to loss causation. However, because the court is allowing the amendments, Singer may present argument on this issue in the event the case proceeds to summary judgment or trial.

14

relevant to scienter or other elements of Singer's claims and therefore Singer should be afforded an opportunity "test his claim on the merits," with the benefit of a fully-developed factual record. *See Foman*, 371 U.S. at 182. Of course, Trans1 is free to argue that the amendments do not support an inference of scienter or the existence of actionable misrepresentation in the context of a renewed motion to dismiss.

## V. RENEWED MOTION TO DISMISS

The Clerk of Court will docket Singer's proposed amended complaint [DE-51-2] as the new operative complaint in this case either contemporaneously with the filing of this order or shortly thereafter. After the amended complaint is docketed, Trans1 shall have twenty-one days to file a responsive pleading or motion in accordance with Rule 12 of Federal Rules of Civil Procedure. The court is specifically allowing more time than Rule 15(a)(3) typically provides due to the complexity of the issues involved in this case. For the same reason, the court is also open to allowing extensions of the twenty-one day deadline. Trans1 may request extensions by filing a motion with the court.

Because the court did not rule on any of Trans1's other 12(b)(6) arguments in the September 19, 2013 order, Trans1 is free to repeat those arguments in a renewed motion to dismiss the amended complaint. However, in light of the discussion above, the court is now satisfied that the complaint adequately alleges loss causation. Unless an intervening change is law warrants reconsideration of the loss causation issue, Trans1 is advised that rearguing the loss causation issue in a renewed motion to dismiss will likely waste precious space in its briefing.

## VI. LOSS CAUSATION THEORY

In an effort to clear up any confusion that may have been caused by September 19 order,

the court briefly notes the loss causation standard that Singer must satisfy in the event this case proceeds to summary judgment or trial. Singer's loss causation allegations will be evaluated under the materialization of a concealed risk standard announced in *Katyle* and *Teachers' Retirement*. That is, Singer must demonstrate that "negative investor inferences drawn from the disclosures were a foreseeable materialization of the risk concealed." *Katyle*, 637 F.3d at 477 & n.10 (internal quotation marks omitted); *see also Teachers' Ret.*, 477 F.3d at 187 n.3 ("We acknowledge the possibility that a plaintiff could successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss. In such a case, the plaintiffs would not need to identify a public disclosure that corrected the previously misleading disclosure because the news of the materialized risk would itself be revelation of the fraud that caused the plaintiff's loss."). However, because the Fourth Circuit has not addressed the theory in detail, the parties may draw from case law in other circuits (including district court and bankruptcy cases) to support their loss causation arguments at the summary judgment stage.[8] Of course, Singer is free to argue at summary judgment that the evidence received in discovery demonstrates loss causation under the corrective disclosure theory (as announced in *Katyle* and *Teachers' Retirement*) as well. However, he must still address the court's concerns with the corrective disclosure theory expressed in the September 19 order.

## VI. CONCLUSION

Singer's motion for reconsideration [DE-50] is ALLOWED. The court VACATES the prior judgment entered on September 19, 2013 [DE-49] and the court's September 19, 2013

---

[8] Nothing in this order should be construed as representing the court's position on whether the amended complaint will survive Trans1's renewed motion to dismiss.

order [DE-48] under Federal Rules of Civil Procedure 59 and 60. The Clerk of Court is DIRECTED to separately docket the proposed amended complaint at docket entry 51-2 as the operative complaint in this case. Trans1 shall have twenty-one days to file a responsive pleading or motion under Rule 12 of the Federal Rules of Civil Procedure from the date the complaint is docketed, though the court will consider extending this deadline as needed.

SO ORDERED

This the 5th day of May, 2014.

*James C Fox*
JAMES C. FOX
Senior United States District Judge